J-S39007-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ABDEL ANDERSON-MYLES | : | |
| | : | |
| Appellant | : | No. 3322 EDA 2019 |

Appeal from the Judgment of Sentence Entered August 22, 2019
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0003553-2015

BEFORE: LAZARUS, J., OLSON, J., and PELLEGRINI, J.[*]

MEMORANDUM BY LAZARUS, J.: **FILED OCTOBER 02, 2020**

Abdel Anderson-Myles appeals from the judgment of sentence, entered in the Court of Common Pleas of Delaware County, following his conviction after a nonjury trial of two counts of indecent assault,[1] and one count each of rape,[2] aggravated indecent assault,[3] involuntary deviate sexual intercourse—

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 3126(a)(1).

[2] 18 Pa.C.S.A. § 3121(a)(1).

[3] 18 Pa.C.S.A. § 3125(a)(1).

forcible compulsion,[4] corruption of minors,[5] unlawful restraint—serious bodily injury,[6] and false imprisonment.[7]  Upon careful review, we affirm.

The victim in this matter, A.P., who was 17 years old at the time of the incident, testified that Anderson-Myles raped her at his home in Upper Darby on February 17, 2015.  *See* N.T. Trial, 12/28/17, at 7, 9, 13.  A.P. stated that she met Anderson-Myles on Instagram and had known him for approximately two to three weeks prior to the incident.  *Id.* at 8, 10.  A.P. testified that her only previous interaction with Anderson-Myles had been through texting or messaging on Instagram and that she had never met him in person prior to February 17.  *Id.*  On that date, A.P. stated that Anderson-Myles suggested they meet at his house.  A.P. took a bus to his neighborhood; Anderson-Myles met her at the bus stop and the two went to his house together.  *Id.* at 13.  A.P. testified that, as she and Anderson-Myles arrived at the residence, Anderson-Myles' father was just leaving to go to the store.  *Id.* at 14.  She heard the sounds of a video game, "like somebody was upstairs."  *Id.*  A.P. and Anderson-Myles sat down "right next to each other" on a two-seat couch, and he turned on Netflix.  *Id.* at 16.

---

[4] 18 Pa.C.S.A. § 3123(a)(1).

[5] 18 Pa.C.S.A. § 6301(a)(1)(i).

[6] 18 Pa.C.S.A. § 2902(a)(1).

[7] 18 Pa.C.S.A. § 2903(a).

As the two watched Netflix, they "sat a little closer to each other, [and] got comfortable." *Id.* at 17. A.P. testified that, at that point, Anderson-Myles "tried to come on to [her]" and aggressively touched her. *Id.* He touched her inner-thigh area and then attempted to kiss her, *id.*, at which point she half-heartedly pushed him away. *Id.* at 19 ("Once he tried to kiss me and then you know how you reject someone but you don't fully[,] like[,] push them . . . but you, you know, you're still pushing away."). A.P. testified that Anderson-Myles then stood up, pulled out his penis and "forced [her] to suck it" while pulling on her hair. *Id.* at 20. Anderson-Myles then pushed her face into the couch, causing A.P.'s contact lenses to fall out. *Id.* at 22. He then pulled her leggings down and placed his penis in her vagina. *Id.* at 23.

When Anderson-Myles finished, A.P. stated that she pulled her leggings up and went into the kitchen to put her contact lenses back in her eyes. *Id.* at 25. A.P. testified that Anderson-Myles told her she "better not . . . tell anyone." *Id.* at 26. He also mentioned that his brother was upstairs and had heard everything. *Id.* When A.P. went to leave Anderson-Myles' house to go to the store, he insisted on accompanying her and followed her around the store while she shopped and checked out. *Id.* at 27-29. As she left the store, he continued to follow her. *Id.* at 29. A.P. testified that she then saw her bus coming, so she ran to catch it. *Id.*

After A.P. arrived home, at approximately 5:30 p.m. on the 17th, she told her mother what had happened. *Id.* at 30. Her mother did not have a car, so they waited for her grandfather to arrive, at which time he took A.P.

to the hospital. ***Id.*** She subsequently gave a statement to police after hospital staff encouraged her to do so. ***Id.*** at 32.

Anderson-Myles' grandmother, Joan Marie Patterson, testified on his behalf at trial. Patterson testified that she first met A.P. when A.P. visited Patterson's daughter's house with Anderson-Myles. N.T. Trial, 3/9/18, at 7. However, Patterson testified that she "didn't really know her until she came to [Patterson's] house on a Sunday.[8] ***Id.*** at 7-8. Patterson testified that, on

_____

[8] It is unclear, based on Patterson's responses to counsel's questioning, whether she met A.P. before or after the incident giving rise to the charges in this matter. She initially testified that she met A.P. "about two years ago." N.T. Trial, 3/9/18, at 7. Defense counsel subsequently attempted to clarify the timeline as follows:

> Q: Did you see [A.P.] at your daughter's house prior to any [c]ourt proceedings or anything that started the [c]ourt proceeding?
>
> A: No. Prior, no. Not prior, no.

***Id.*** at 12. Later, on cross-examination, Commonwealth counsel again sought to clarify the issue:

> Q: So I just want to clarify a few things that you just said.
>
> A: Okay.
>
> Q: [Defense counsel] had just said that you—I'll just start over. So, the first time that you saw [A.P.,] was that before or after the first time you went to [c]ourt?
>
> A: First time—no, it was the first—we never had went to [c]ourt then.
>
> Q: We hadn't gone to [c]ourt yet?
>
> A: No.

that occasion, A.P. acted "like she didn't want to be seen and kept her coat on . . . like she felt uncomfortable." *Id.* at 8.  Later, while Patterson was making dinner, A.P. and Anderson-Myles went upstairs, where A.P. came on to Anderson-Myles and took off her clothes.  *Id.* at 9.  Patterson stated that she "saw her[,] like[,] halfway clothed, she was almost clothed and then[,] like[,] she was lying in the bed and I pulled the blanket up and she had no underwear on."  *Id.*  Patterson testified that she then asked A.P. to leave and A.P. got angry with her.  *Id.* at 9-10.  Patterson stated that she saw A.P. one more time at her daughter's house, which "wasn't too long after [Patterson] threw her out" of her house.  *Id.* at 12.

Tracy Nicole Mamadou, Anderson-Myles' mother, also testified on his behalf.  She stated that A.P. was one of her son's friends and that A.P. "visited [Mamadou's] house before and we all went out before." *Id.* at 25.  Mamadou testified that she had met A.P. on three occasions prior to the incident in question.  *Id.* at 25.  The first time she met A.P., Mamadou took her and Anderson-Myles to the movies.  *Id.* at 26.  On their second meeting, A.P. "came to [Mamadou's] house with a friend and did [Mamadou's] daughter's hair[.]" *Id.* at 26.  On their third meeting, A.P. came to visit Anderson-Myles

---

Q: Okay.  That time, you had said was two years ago?

A: Maybe it was two, could have been more, I don't—

Q: Okay.  I gotcha, gotcha.

*Id.* at 14.

at Mamdou's home. *Id.* Mamadou testified that Anderson-Myles knew A.P. from school. *Id.* at 27.

Finally, Gregory Garner, a close friend of Anderson-Myles, testified for the defense. *Id.* at 31. Garner testified that he attended Upper Darby High School with Anderson-Myles and knew A.P. through him. *Id.* Garner testified that he had seen them together three times and each time "they were touchy, you know, all up on each other. I seen [*sic*] them kiss multiple times." *Id.* at 33. Garner had also seen A.P. in the hallways at Upper Darby High School. *Id.* at 36.

Anderson-Myles was arrested and charged with the above-named offenses. He opted for a nonjury trial,[9] after which the court convicted him of all charges. On August 22, 2019,[10] the court sentenced Anderson-Myles to an aggregate term of 13 to 26 years' incarceration. Anderson-Myles was also designated a Tier III lifetime registrant under the Sexual Offender Registration and Notification Act. He was deemed not to be a sexually violent predator.

---

[9] The trial in this matter was bifurcated. The court heard testimony from the Commonwealth's sole witness, A.P., on December 28, 2017. The defense presented its witnesses on March 9, 2018. After taking the matter under advisement, the court rendered its verdict on March 19, 2018.

[10] Sentencing was initially scheduled to be held on June 4, 2019. However, Anderson-Myles failed to appear, and the court issued a bench warrant for his arrest. Anderson-Myles was eventually apprehended on August 19, 2019, and sentencing was held three days later.

Anderson-Myles filed a post-sentence motion for reconsideration of sentence, which the court denied. On November 18, 2019, he filed a timely notice of appeal. On November 20, 2019, the trial court ordered Anderson-Myles to file, within 20 days, a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On December 10, 2019, Anderson-Myles' then-counsel filed a statement, pursuant to Rule 1925(c)(4), of his intent to file a brief pursuant to **Anders**[11] and to seek permission to withdraw as counsel. Accordingly, the trial court did not issue a Rule 1925(a) opinion.

Subsequently, Anderson-Myles retained private counsel, who entered his appearance before this Court[12] and filed an advocate's brief raising the following claim:

> Whether [Anderson-Myles'] case should be remanded to the [trial] court based on [after--]discovered evidence on social media wherein the complainant stated "that judge and [district attorney] was dumb enough to believe me" and that she filed a complaint against [Anderson-Myles] because she was a jilted lover?

Brief of Appellant, at 2.

Anderson-Myles' claim is based on an Instagram conversation between his close friend, Garner, and A.P., which occurred a few days after Anderson-Myles was convicted. Garner provided an undated statement, which is

---

[11] **Anders v. California**, 386 U.S. 738 (1967).

[12] The Delaware County Office of the Public Defender withdrew its appearance on Anderson-Myles' behalf.

contained in the reproduced record submitted by Anderson-Myles and reads, in relevant part, as follows:

> Within a few days after [Anderson-Myles] had been convicted, [A.P.] Instagrammed me. The attached Instagram posts reflect the conversation I had with her. Basically, [A.P.] said that she had [Anderson-Myles] arrested because he left her for another woman. I responded that it was wrong for her to make up a lie and say that [Anderson-Myles] had raped her and she responded:
>
> > "IDGAF [I don't give a fuck] it is what it is and that **Judge and DA was dumb enough to believe me**."
>
> (emphasis added). She also said:
>
> > "When he in jail and get convicted, Ima be like... yaw some clown ass niggas."
>
> It is clear that she was trying to rub in my face that she was able to get my good friend convicted and basically said that there was nothing I could do about it.
>
> After receiving this Instagram, I emailed Howard Anmuth, Esquire, [Anderson-Myles'] trial attorney[,] to tell him I just received this Instagram. I never heard back from him.

Garner Statement, at 1-2. Anderson-Myles asserts that this evidence reveals A.P.'s motive for falsifying her accusation against him and, "when considered along with other evidence not presented at trial, provides a compelling basis for the grant of a new trial." Brief of Appellant, at 18.

The "other evidence not presented at trial" consists of two text messages, allegedly sent by A.P., that Anderson-Myles was aware of and communicated to trial counsel at the time of trial. The first was purportedly sent to Anderson-Myles' mother, Tracey Mamadou, on April 15, 2016, and reads as follows:

> Hey miss Tracey this [is A.P.] just tell ur fucking son to leave that bitch and choose me and I'll stop with all this if not I make sure [Anderson-Myles] goes and rot in fucking jail . . . tell him to text this number.

Brief of Appellant, at 12 (ellipses in original).

In his brief, Anderson-Myles describes the second text message, and its attendant circumstances, as follows:

> [A.P.] also had contacted Isaiah Gray, a friend of [Anderson-Myles], [a fact] which was apparently unbeknownst to A.P. While Mr. Gray cannot pinpoint the exact date of their communication, based upon his age and his recollection that it happened before the second trial date, it appears to have occurred sometime between February 2, 2019, his 24th birthday[,] and the next trial date, which was March 9, 2019.[13] The sum and substance of their conversation is attached [in the reproduced record].
>
> The critical part of this exchange occurred after they exchanged pleasantries, including their ages, and where they lived. In response to the fact that Gray said he lived in Lansdowne, [A.P.] stated:
>
> > "I used to talk to some cornball ass nigga around there."
>
> After engaging in other small talk, [A.P.] wrote:
>
> > "yeah but the nigga I talked around there name was Abdel I love him and all that but he had the nerve to cheat on me multiple times then fuck my friend so I got his ass caught up and lied to the cops about him raping me. Can you believe . . . that shit . . . plus he did me dirty lma [*sic*] a lot of other ways also what goes around comes around[.]

*Id.* at 13 (ellipses in original).

In his brief, Anderson-Myles' counsel states the following:

> While [c]ounsel has not included a [s]tatement from Mr. Anderson-Myles about communicating these matters to [trial]

_____

[13] The second half of Anderson-Myles' bifurcated trial actually occurred on March 9, 2018.

counsel, he has related to [appellate c]ounsel that the text to his mother and the Instagram repartee between [A.P.] and Mr. Gray were communicated to [trial] counsel[,] who chose neither to confront [A.P.] with nor present them at trial. Because [c]ounsel was sick for nearly a month in early April, is now working part-time and the fact that Mr. Anderson-Myles has been quarantined because he apparently tested positive for coronavirus, [c]ounsel has not obtained a [s]tatement from him in time to include in the [r]eproduced [r]ecord, but has proffered his conversation with Mr. [Anderson-]Myles instead.

Brief of Appellant, at 14 n.5 (citation to reproduced record omitted).

Anderson-Myles now seeks a new trial based on after-discovered evidence—specifically, A.P.'s Instagram communication with Garner. Pennsylvania Rule of Criminal Procedure 720(C) requires that "[a] post-sentence motion for a new trial on the ground of after-discovered evidence *must be filed in writing promptly after such discovery*." Pa.R.Crim.P. 720(C) (emphasis added). "Accordingly, *after-discovered evidence discovered during the post-sentence stage must be raised promptly with the trial judge at the post-sentence stage*; after-discovered evidence discovered during the direct appeal process must be raised promptly during the direct appeal process, and should include a request for a remand to the trial judge[.]" **Id.**, comment (emphasis added).

Here, it appears from the available record that trial counsel was made aware of the after-discovered evidence in question—the Instagram message from A.P. to Gregory Garner—shortly after Anderson-Myles was convicted on

- 10 -

March 19, 2018, and well in advance of his sentencing on August 22, 2019.[14]

Despite being informed of this potentially significant and exculpatory

_____

[14] Although unclear, it seems possible that counsel was in possession of this information even before the trial court announced its verdict on March 19, 2018. In court on that date, immediately after the trial court announced its verdict, the following exchange occurred:

> [DEFENSE COUNSEL]: Your Honor, at this point in time, I am going to notify the Court that I am going to have a post-trial motion for new evidence that was brought to my attention after the final testimony was given and the new evidence came, I guess, to a witness after that time period, but prior to the verdict.
>
> THE COURT: All right.
>
> [DEFENSE COUNSEL]: So I have to make a post-trial motion for that, Your Honor.
>
> THE COURT: And that would be to another [j]udge or to me?
>
> [DEFENSE COUNSEL]: May I confer with counsel?
>
> THE COURT: Yes.
>
> [DISTRICT ATTORNEY]: It is—for a second. It is so new that I think Howard and I should probably review it in full and get some type of a way that we can get it onto paper. At this particular point, I think it would probably go to Your Honor even though you were the fact finder, there's no way that you'd be prejudiced at this particular point if you're—if you use the information after the decision was made. Although, I'll still—we'll still confer with our Appeals Department. We still have to find a way to get this information.
>
> THE COURT: Okay. Because I don't—
>
> [DISTRICT ATTORNEY]: I still have not yet seen it.
>
> THE COURT: —I do not want this—the [d]efendant to prejudiced in any way. So if it's something that needs to be, you know, briefed—

evidence, trial counsel did nothing with the information and, most importantly, failed to promptly file with the trial judge a motion for a new trial on the basis of after-discovered evidence as required by Rule 720(C). Accordingly, we are constrained to find Anderson-Myles' claim waived on appeal.[15]

Judgment of sentence affirmed.

Judgment Entered.

*Joseph D. Seletyn*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/2/20

---

[DISTRICT ATTORNEY]: And we may, we may.

N.T. Trial, 3/19/18, at 6-7.

While counsel did not specify the nature of the after-discovered evidence in question, it is reasonable to infer he was referring to the social media exchange between A.P. and Garner that is the subject of Anderson-Myles' instant claim.

[15] We can only speculate as to why, despite being aware of their existence at the time of trial, trial counsel chose not to utilize the messages allegedly sent by A.P. to Anderson-Myles' mother and Isaiah Gray to impeach A.P.'s testimony at trial. However, the proper venue for Anderson-Myles to challenge counsel's stewardship of his defense lies in proceedings under the Post Conviction Relief Act. *See* 42 Pa.C.S.A. §§ 9541-9546.